IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Survivors Network of Those Abused by Priests, Inc., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No.    4:12-cv-1501 ERW |
| v | ) ) | |
| Jennifer Joyce, *et al.*, | ) ) | |
| Defendants. | ) | |

## JOINT STIPULATION OF FACTS

Come now the parties, in accordance with the Case Management Order entered on October 3, 2012, and submit the following "JOINT Stipulation of all uncontested facts, which may be read into evidence subject to any objections of any party set forth in said stipulation."  (Doc. # 35).

### I.    Stipulated Facts Without Objections

1.    Plaintiff Survivors Network of Those Abused by Priests, Inc. ("SNAP"), is a not-for-profit corporation organized and registered under the laws of the State of Illinois and registered as a foreign corporation in good standing with the State of Missouri.

2.    SNAP is a network of survivors of religious sexual abuse and their supporters who work to protect the vulnerable, heal the wounded, and prevent abuse, including by educating their communities about the effects of abuse and exposing the malignant actions of abusive religious ministers and the church officials who shield them.

3.    Plaintiff David Biersmith is resident of the State of Missouri.

4.    Biersmith is a member of Voice of the Faithful-Kansas City ("VOTF-KC"), an association organized in response to the sexual abuse crisis within the Catholic Church

1

and collaborates with SNAP.

5.      Biersmith is committed to assisting survivors of sexual abuse within the church, supporting priests of integrity, protecting children, and working toward full lay participation in church governance.

6.      Plaintiff Holly Hesemann is a resident of the State of Missouri.

7.      Hesemann  is a member of SNAP.

8.      Plaintiff Call to Action, Inc. ("CTA"), is a not-for-profit corporation organized and registered under the laws of the State of Illinois.

9.      CTA's mission is to educate, inspire, and activate Catholics to act for justice and build inclusive communities through a lens of anti-racism and anti-oppression principles.

10.     CTA's vision is to be the leader in challenging Catholics to act for justice and build inclusive communities.

11.     Defendant Jennifer Joyce M. Joyce is the Circuit Attorney for the City of St. Louis.

12.     Joyce is responsible for commencing and prosecuting criminal actions, including alleged violations of § 574.035, within the City of St. Louis.

13.     Defendant Samuel Dotson, III, is the Chief of Police for the Metropolitan Police Department for the City of St. Louis.[1]

14.     Dotson is responsible for enforcing Missouri criminal statutes, including § 574.035, within the City of St. Louis.

---

[1]      Daniel Isom was originally named as a defendant in this case, but only in his official capacity as Chief of the St. Louis Metropolitan Police Department.  Isom no longer serves in that office, and his successor, Dotson, has been substituted for him in this litigation.  (Doc. # 42).

15.     Defendant Chris Koster is the Attorney General of the State of Missouri.

16.     The Attorney General is the State's chief law enforcement officer.

17.     The Attorney General is charged with instituting any proceedings necessary to enforce state statutes.

18.     The Attorney General is also authorized to aid prosecutors when so directed by the Governor and to sign indictments when directed by the court.

19.     The Attorney General represents the state on appeal in all felony cases.

20.     Defendant Ronald K. Replogle is the Superintendent of the Missouri Highway Patrol.

21.     As superintendent of a statewide law-enforcement agency, Replogle is responsible for the enforcement of § 574.035 against persons who come into contact with the Missouri Highway Patrol within the State of Missouri.

22.     In recent years, the Missouri Highway Patrol has been repeatedly called on to assist local law enforcement with protests and pickets near houses of worship and has responded to those requests by providing assistance.

23.     Defendants do not rely on any facts in support of their legal arguments in defense of the House of Worship Act other than those alleged and admitted in the pleadings.

24.     Defendants do not intend to call any witnesses or rely on any documents in defense of the House of Worship Act.

25.     Plaintiffs have organized and engaged in (and will in the future organize and engage in) expressive activity near locations designated as a "house of worship" by MO. REV. STAT. § 574.035.

3

26.    Plaintiffs have been chilled from engaging in expressive activity because of § 574.035.

27.    SNAP and those who participate in SNAP's expressive activities in Missouri, including Hesemann, Biersmith, and members of CTA (collectively "SNAP members"), intend to articulate particular messages to those who attend religious services at particular churches, or work in particular church buildings.

28.    Outside churches when Masses are being held, SNAP members hold signs, hand out fliers, and verbally communicate multiple messages in order to reach parishioners in churches where alleged predator priests might work.

29.    The messages SNAP members communicate outside churches where Masses are being held include:

   a.    Urging parishioners to demand accountability from the church leaders;

   b.    Urging attendees to call the police if they have seen suspicious behavior by the priest; and

   c.    Challenging listeners that they have a moral and civil obligation to report crimes.

30.    Outside venues where church leaders are meeting SNAP members pass out fliers and verbally communicate multiple messages.

31.    The messages SNAP members communicate outside venues where church leaders meet include:

   a.    Encouraging church leaders to honor the Pope's recent stated wishes to "come clean" about all proven, admitted, and credibly accused predatory priests;

4

b. Encouraging anyone who may have seen, suspected, or suffered clergy sex crimes or cover-ups to call the police, get help, expose predators, protect others, and start healing; and

c. Shaming church leaders regarding legal maneuvers and technicalities, which SNAP members think wrongly block children sex lawsuits against known predators.

32. Outside church headquarters, SNAP members hold pictures of those abused and verbally communicate multiple messages.

33. The messages SNAP members communicate outside church headquarters include:

a. Urging citizens and Catholics –especially current and former church employees– to share what they know about clergy sex crimes and cover-ups with police and prosecutors; and

b. Encouraging anyone who may have been hurt by clerics to step forward, get help, and start healing.

34. Outside one particular St. Louis friary –within a mile of five daycare centers, four elementary schools, and a park with a playground– where an alleged predator priest resides, SNAP members pass out fliers and verbally communicate multiple messages.

35. The messages SNAP members communicate outside this friary include:

a. Warning those who live nearby that an accused child molesting cleric – who was suspended and sued– is now living there;

    b.  Prodding local Catholic officials to disclose the whereabouts of another allegedly abusive priest;

    c.  Encouraging church officials to warn others about the alleged predators; and

    d.  Urging others who saw, suspected, or suffered to come forward.

36.    Biersmith also participates in informational pickets unconnected to SNAP, as part of VOTF-KC.

37.    In his VOTF-KC pickets, Biersmith intends to articulate a particular message to those who attend religious services, work, or frequent the buildings outside of which he communicates.

38.    Biersmith's two sons were raped and sodomized by Hugh Monahan, a Catholic priest, starting when they were 9 and 12 years old.

39.    In response to reports of abusive priests in his Catholic Diocese of Kansas City-St. Joseph, Bishop Robert Finn, reportedly commented that "Boys will be boys."

40.    Biersmith was so outraged by Finn's comment and what Biersmith believes is the Church's failure to protect children –including his own– that he regularly stands outside Finn's principal Church, the Cathedral of the Immaculate Conception in Kansas City, on the sidewalk, holding a sign that reads:  "'Boys will be boys,' Bishop Finn."

41.    Biersmith's picket activities are intended to convey multiple messages, including:

    a.  Finn just does not get *it* (i.e., the magnitude of the sexual abuse problem how his attitude perpetuates the problem);

    b.  The issue of child sexual abuse at the hand of the clergy is not over; and

    c.   People need to know about the abuse to which Biersmith's sons and others were subjected so they can protect their own children and work for institutional change.

42.    Biersmith also regularly pickets outside the Catholic Center of the Catholic Diocese of Kansas City-St. Joseph, which includes the Chancery offices for the Diocese, and is used for religious purposes.

43.    Biersmith pickets at this location during work days in order to reach both Finn, who works in the building, as well as other employees of the diocese.

44.    In addition to the messages Biersmith conveys at the Cathedral, his pickets outside the Catholic Center articulate his message that the Diocese's employees must share what they know about clergy sex crimes and cover-ups with police and prosecutors.

45.    Participants in informational pickets sponsored by Call to Action Inc., near houses of worship, including those held by CTA's two Regional Chapters in Missouri, hold signs, say prayers, sing songs, tell our stories, and distribute flyers in order to articulate the particular messages they are trying to communicate to the particular audience they are trying to reach (e.g., church goers, church leaders, church employees, etc.).

46.    Messages conveyed by participants in CTA's pickets include support for:

    a.   full equality for lesbian, gay, bisexual and transgender people both in the Church and in civil society, including marriage equality;

    b.   women's rights, including ordination and participation as altar girls;

    c.   racial justice; and

    d.   protecting children from abusive clergy.

47.    The only government interest advanced by Defendants is that §574.035

protects "those engaging in the free exercise of religion on private property[.]"

48.    The Plaintiffs' primary intended audiences are people attending specific churches or other locations designed as a house of worship.

49.    The Plaintiffs' purpose in engaging in expressive conduct near houses of worship is to reach an audience that can only be addressed at such a location and to convey to such an audience a particular message.

50.    Plaintiffs are certain there is no other time or place that they can get their messages to their intended audiences.

51.    To reach church leaders, Plaintiffs need to picket where church leaders gather.

52.    To reach church administrators and workers, Plaintiffs need to picket buildings where administrators and employees work.

53.    To reach those attending a particular church, including those whom have been hurt by priests, Plaintiffs need to picket specific churches when their parishioners are present.

54.    Plaintiffs do not know whether a police officer would consider their expressive activity to disturb, interrupt, or disquiet a house of worship, think it profane, rude, or indecent.

55.    Plaintiffs' messages could be considered by some to be profane, rude, or indecent.

56.    Plaintiffs' messages should, in Plaintiffs' view, be (and often are) disturbing or disquieting to Catholics.

57.    Most of the fliers that SNAP distributes near house of worship include some

form of the introduction like "We're very sorry to intrude[.]"

58.    The content of SNAP's fliers have included the following:

a.   "She's 19… a priest raped her";

b.   "When good Catholics stay silent… kids are at risk and victims are hurt even more"; and

c.   "We were molested as kids by priests.  We don't want other child [sic] to suffer as we have.")

59.    Whether any expressive activity near a location designated as a house of worship will be deemed to disturb a house of worship, interfere with those seeking access to a house of worship, disquiet a house of worship, disturb the order and solemnity of worship services, or constitute profane discourse or be rude or indecent is not always predictable.

60.    While a majority of SNAP's leaflet distributions are held at churches to reach churchgoers, SNAP members also distribute leaflets at other buildings or structures, or public or private places used for religious worship, religious instruction, or other religious purpose.

61.    While a majority of Biersmith's informational pickets are held at churches to reach churchgoers, he regularly pickets on the sidewalk in front of the Catholic Center. While the Catholic Center is not a church, he has learned that that it has a chapel inside and that it being used for religious instruction and other religious purposes.

62.    While most of CTA's informational pickets are held at churches on public sidewalks, occasionally, they get approval from church leadership to hold a demonstration on church property.

9

63.     A recent example of a church-approved demonstration on church property was when St. Louis hosted the convention of Leadership Conference of Women Religious (LCWR), an organization of nuns, in August 2012.

64.     During the CTA's planned demonstration, held in on the steps of the Cathedral Basilica, CTA members sang songs, read scripture, and voiced their support of LCWR in words, signs, and handouts.

65.     CTA's message of support for LCWR and against church hierarchy was in response to the fact that the Vatican had recently released a document, the *Doctrinal Assessment of the Leadership Conference of Women Religious*, which called for LWCR to reform and separate themselves from justice issue including women's ordination; inclusion of lesbians, gays, and transgender individuals; and social justice.

66.     Given CTA's support for these issues –contrary to the church's position– CTA's members wanted to express their views publicly and at a location where their message of support would their reach intended audiences.

**II.     Stipulated Facts to Which There is an Objection**

1.     Fact:  Plaintiffs do not know whose definition of the terms in the statute (i.e., disturb, interrupt, or disquiet, profane, rude, and indecent) matters because these terms are vague and subjective.

        Objection:   Defendants do not object to the factual assertions, but object to the extent that whether the terms are vague is a conclusion of law.

2.     Fact:  Since § 574.035 went into effect, there have been four or five occasions when ushers at the Cathedral have told Biersmith that they were offended by his message outside the Cathedral where churchgoers had to walk by him as they went to

Mass.

     Objection:  Defendants object that this statement constitutes inadmissible hearsay.

     3.     Fact:  On one of those occasions, an usher put his hand on Biersmith, told him to "move on," and threatened that if he did not do so "[he] would be in jail in 20 minutes."

     Objection:  Defendants object that this statement constitutes inadmissible hearsay.

Respectfully submitted,

|  | CHRIS KOSTER<br>Attorney General |
|---|---|
| /s/ Anthony E. Rothert | /s/ J. Andrew Hirth |
| ANTHONY E. ROTHERT, #44827MO | J. Andrew Hirth, #57807MO |
| AMERICAN CIVIL LIBERTIES UNION<br>   OF EASTERN MISSOURI | Deputy General Counsel |
|  | 207 West High Street |
| 454 Whittier Street | P.O. Box 899 |
| St. Louis, Missouri 63108 | Jefferson City, Missouri 65102 |
| (314) 652-3114 | (573) 751-0818 |
| FAX: (314) 652-3112 | FAX: (573) 751-0774 |
| *Attorneys for Plaintiffs* | *Attorneys for Defendants* |

11

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2013, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system and a copy was made available to all electronic filing

participants:

/s/ Anthony E. Rothert